# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMUNITY IN-POWER AND
DEVELOPMENT ASSOCIATION, INC., *et al.*,

      Plaintiffs,

      v.

E. SCOTT PRUITT, *in his official capacity as*
Administrator of the Environmental Protection
Agency,

      Defendant.

No. 16-cv-1074 (KBJ)

## MEMORANDUM OPINION

Several environmental advocacy groups ("Plaintiffs") have banded together to

file this action against the Environmental Protection Agency ("the EPA" or "the

agency") pursuant to the Clean Air Act's citizen suit provision, 42 U.S.C. § 7604(a)(2).

Plaintiffs seek to compel the EPA to perform obligatory and long-overdue rulemakings

to protect people and the environment from hazardous air pollution (*see* Compl., ECF

No. 1, ¶ 1), and the EPA admits that it has violated the Clean Air Act's prescriptions,

insofar as the agency has failed to promulgate revised emission standards for the nine

source categories of pollutants at issue in this case in a timely fashion (*see* EPA's Mem.

in Opp'n to Pls.' Mot. for Summ. J. & in Supp. of Cross-Mot. for Summ. J. ("Def.'s

Mem."), ECF No. 29-3, at 6).[1]  Based on that admission, all that remains of this dispute

---

[1] Page-number citations to the documents that the parties have filed refer to the page numbers that the
Court's electronic filing system automatically assigns.  Any citations to the EPA's cross-motion for
summary judgment and its attachments thereto, including the memorandum in support, refer to the page
numbers of the corrected cross-motion for summary judgment that this Court ordered the EPA to
provide.  (*See* Min. Order of June 15, 2017; *see also* General Order & Guidelines, ECF No. 8.)

is a determination of how quickly the EPA must act to issue the revised emission standards.

Before this Court at present are Plaintiffs' and the EPA's motions for summary judgment regarding that sole issue. (*See* Mot. of Pls. for Summ. J. ("Pls.' Mot."), ECF No. 21; EPA's Cross-Mot. for Summ. J. ("Def.'s Cross-Mot."), ECF No. 23.) The parties propose drastically different timelines for the EPA to act: Plaintiffs request a completion schedule of no more than two years from the date of this Court's Order (*see* Pls.' Mot. at 46), while the EPA asks for approximately seven years, until January of 2025, to complete the required rulemakings (*see* EPA's Reply Mem. in Supp. of Cross-Mot. for Summ. J. ("Def.'s Reply"), ECF No. 34, at 6). Having considered the parties' briefs, their presentations at the motion hearing held on November 30, 2017 (*see generally* Tr. of Mot. Hr'g (Nov. 30, 2017) ("Hr'g Tr."), ECF No. 40), and the EPA's declarations, this Court will order the EPA to comply with its statutory obligations as expeditiously as possible, although not on the extremely compressed timeline Plaintiffs propose. Specifically, the EPA must complete all nine overdue rulemakings over the next three and a half years, and no later than October 1, 2021. Accordingly, Plaintiffs' motion for summary judgment will be **GRANTED IN PART** and **DENIED IN PART**, and Defendant's cross-motion for summary judgment will be **DENIED**. A separate Order consistent with this Memorandum Opinion will follow.

# I. BACKGROUND

## A. The Clean Air Act

Congress enacted the Clean Air Act, 42 U.S.C. § 7401, *et seq.*, in 1963, "to protect and enhance the quality of the Nation's air resources so as to promote the public

health and welfare and the productive capacity of its population." *Id.* § 7401(b)(1). In 1990, Congress overhauled the Act and implemented "an aggressive regime of new control requirements to address four crucially important air pollution problems: urban smog, hazardous air pollution, acid rain, and depletion of the stratospheric ozone layer." *Cal. Cmtys. Against Toxics v. Pruitt*, 241 F. Supp. 3d 199, 200 (D.D.C. 2017); *see also Blue Ridge Envtl. Def. League v. Pruitt*, 261 F. Supp. 3d 53, 55 (D.D.C. 2017) (explaining that the overhaul resulted from Congress's recognition that the Act had "worked poorly" up to that point). Among many other changes, the 1990 amendments created an initial list of hazardous air pollutants, such as cyanide, mercury, and phosphorous, *see* 42 U.S.C. § 7412(b)(1), and imposed a series of deadlines by which the EPA was required to promulgate, and periodically revise, emission standards for sources that emit those pollutants, *see id.* § 7412(c)(1), (c)(2), (d).

Two of those deadlines are relevant here. First, the Act states that the EPA "shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section *no less often than every 8 years*[.]" *Id.* § 7412(d)(6) (emphasis added). This means that, within that timeframe, the EPA must conduct what is known as a "technology review" to determine whether the agency should modify current emission standards in light of any improvements in pollution control technology. (Decl. of Panagiotis Tsirigotis ("June Tsirigotis Decl."), ECF No. 29-5, ¶ 4.) Second, the EPA must consider any risks to public health or the environment that remain despite the agency's previously-implemented emission standards, and develop additional standards to mitigate any residual risks. (*See id.*) This "residual risk review" must occur "*within 8*

3

*years after promulgation of standards* for each category or subcategory of sources[.]"

42 U.S.C. § 7412(f)(2)(A) (emphasis added).

The EPA division that is primarily responsible for performing these reviews, as well as any associated rulemakings, is the Sector Policies and Programs Division ("SPPD") within the Office of Air Quality Planning and Standards, Office of Air and Radiation. (*See* June Tsirigotis Decl. ¶¶ 2–3; Decl. of Panagiotis Tsirigotis, Attach. 1 to June Tsirigotis Decl., ECF No. 29-5, ¶ 4.) That division generally performs both the technology review and the residual risk review at the same time, through a combined "risk and technology review" ("RTR") assessment, which is supposed to take place within the eight-year window set forth in the Clean Air Act. (June Tsirigotis Decl. ¶ 4.)

### B.    Procedural History

Plaintiffs filed the complaint in the instant case on June 8, 2016, alleging that the EPA has failed to complete timely either the mandatory technology review or the mandatory residual risk review for the emission standards associated with nine source categories of hazardous air pollutants. (*See* Compl. ¶¶ 54–57.)[2] The applicable due dates for the mandated reviews with respect to each of the nine pollutants are as follows:

---

[2] Plaintiffs' complaint names former EPA Administrator Gina McCarthy as the defendant in this action (*see* Compl. ¶ 11); the current EPA Administrator, Edward Scott Pruitt, has been automatically substituted as the defendant pursuant to Federal Rule of Civil Procedure 25(d). Because Administrator Pruitt is being sued in his official capacity only, this suit functions as an action against the EPA, and will be treated as such for purposes of this Memorandum Opinion. *See Cty. Bd. of Arlington v. U.S. Dep't of Transp.*, 705 F. Supp. 2d 25, 28 (D.D.C. 2010) ("[A]n official-capacity suit is a way of pleading an action against the agency which the official heads.").

| Source Category | Date of Original Promulgation | Deadline for Action Pursuant to § 7412(d)(6) and § 7412(f)(2) |
|---|---|---|
| Primary Copper Smelting | June 12, 2002 | June 12, 2010 |
| Generic MACT II – Carbon Black Production | July 12, 2002 | July 12, 2010 |
| Generic MACT II – Cyanide Chemicals Manufacturing | July 12, 2002 | July 12, 2010 |
| Generic MACT II – Spandex Production | July 12, 2002 | July 12, 2010 |
| Flexible Polyurethane Foam Fabrication Operations | Apr. 14, 2003 | Apr. 14, 2011 |
| Refractory Products Manufacturing | Apr. 16, 2003 | Apr. 16, 2011 |
| Semiconductor Manufacturing | May 22, 2003 | May 22, 2011 |
| Primary Magnesium Refining | Oct. 10, 2003 | Oct. 10, 2011 |
| Mercury Emissions from Mercury Cell Chlor-Alkali Plants | Dec. 19, 2003 | Dec. 19, 2011 |

(*See id.* ¶ 1, Table A.)

Because the required reviews are long overdue at this point, Plaintiffs' complaint asks this Court to declare that the EPA has violated the Clean Air Act, and order the agency to perform the mandated rulemakings for the nine source categories "in accordance with an expeditious deadline specified by this Court[.]" (*Id.* ¶ 58; *see also* Pls.' Mot. at 45 (arguing that the Court should compel the EPA to perform the nine overdue rulemakings "as expeditiously as possible" and "within the fastest possible timeframe").) For five of the source categories, which Plaintiffs do not specify, Plaintiffs propose that the EPA be required to issue notices of proposed rules within eight months of this Court's Order, and to promulgate final rules within one year. (*See* Pls.' Mot. at 46.) For the remaining four source categories, which again Plaintiffs do not specify, Plaintiffs request that notices of proposed rules be issued within twenty months of this Court's Order, and final rules be promulgated within two years. (*See id.*) Thus, Plaintiffs would have the agency promulgate final rules for five source categories

by March 31, 2019, and promulgate final rules for the remaining four source categories by March 31, 2020.

Although the EPA admits "that it has not yet completed its duty to conduct the technology and residual risk reviews pursuant to 42 U.S.C. § 7412(d)(6) and (f)(2) for the nine [source] categories" at issue in this case (Def.'s Mem. at 6), it argues that "[t]he issue . . . is not the shortest time period in which [the agency] can issue a rule, but rather the time that is needed for [the agency] to complete a rulemaking that is sufficiently thorough to meet the purpose intended by Congress" (*id.* at 28). The EPA further maintains that Plaintiffs' proposed schedule "would undermine the soundness of the [emissions] rules by not allowing enough time for the [a]gency to gather necessary emissions data or to properly allow for public participation" (*id.* at 16), and thus, Plaintiffs' schedule "would require a significant compromise on the quality of the rule at issue" (*id.* at 28). Instead, the EPA requests significantly more time to complete the mandated rulemakings, as indicated in the schedule below:

| Source Category | EPA Proposed Rule Date | EPA Final Rule Date |
|---|---|---|
| Mercury Emissions from Mercury Cell Chlor-Alkali Plants | July 23, 2021 | July 22, 2022 |
| Semiconductor Manufacturing | Nov. 11, 2021 | Nov. 10, 2022 |
| Generic MACT II – Cyanide Chemicals Manufacturing | Dec. 9, 2021 | Dec. 8, 2022 |
| Generic MACT II – Spandex Production | Dec. 9, 2021 | Dec. 8, 2022 |
| Generic MACT II – Carbon Black Production | Feb. 24, 2022 | Feb. 23, 2023 |
| Primary Copper Smelting | Nov. 17, 2022 | Feb. 8, 2024 |
| Flexible Polyurethane Foam Fabrication Operations | July 20, 2023 | Oct. 10, 2024 |
| Refractory Products Manufacturing | Aug. 24, 2023 | Nov. 14, 2024 |
| Primary Magnesium Refining | Oct. 19, 2023 | Jan. 16, 2025 |

(*See* Def.'s Reply at 6.)

The EPA makes two primary arguments in support of its proposed schedule. First, the EPA claims that all available agency resources to perform the nine RTRs at issue are already "fully utilized" because the agency is in the process of completing several dozen RTRs for *other* source categories within schedules mandated by *other* court orders and consent decrees. (Def.'s Reply at 12; *see also* Def.'s Mem. at 13–14 (listing the other schedules); June Tsirigotis Decl. ¶ 12 (describing the other court-mandated rulemakings as "[c]ritical to the schedules" proposed by the EPA to complete the nine RTR rulemakings in the instant case).) Indeed, in March of last year, two courts from this District ordered the EPA to complete the rulemakings for seven source categories by December of 2018, another twenty source categories by March of 2020, and the remaining six source categories at issue in those cases by June of 2020. *See Blue Ridge*, 261 F. Supp. 3d at 61; *Cal. Cmtys.*, 241 F. Supp. 3d at 207.[3]

Because of these other court-ordered deadlines, the EPA says it will not have the necessary staff and resources available to even *begin* the nine RTRs at issue here until March of 2020—after the agency has completed most of the rulemakings already ordered by other courts. (*See* Def.'s Mem. at 13–15; *see also* June Tsirigotis Decl. ¶ 12 ("All available SPPD staff are now assigned to RTR projects subject to court-ordered deadlines established in these other cases, and the workload for these 33 other RTRs

---

[3] The EPA also identifies several other RTRs that are currently underway. Those RTRs include rulemakings for the Pulp and Paper Combustion Sources source category and the Nutritional Yeast Manufacturing source category, which, pursuant to the order issued in *Sierra Club v. McCarthy*, No. 15-cv-1165, 2016 WL 1055120 (N.D. Cal. Mar. 15, 2016), were due by October 1, 2017. *See id.* at *7. While the instant case was still pending, the EPA successfully completed the RTRs and associated rulemakings for those two source categories within the deadline imposed by the Northern District of California. (*See* Pls.' Notice of Additional Evid. ("Pls.' Notice"), ECF No. 38, at 1.) The agency has also continued to engage in a number of discretionary rulemaking activities relating to the Clean Air Act (*see* Pls.' 2d Notice of Additional Evid. ("Pls.' 2d Notice"), ECF No. 41, at 1–4), and Plaintiffs point out that the agency has also recently requested through the President's 2019 Proposed Budget that Congress *reduce* the funding dedicated to the agency's air quality efforts (*see id.* at 4).

does not allow us to begin work on the 9 RTRs at issue here until most of the work is complete on the 33 RTRs already subject to a court-ordered deadline.").)  But Plaintiffs reject the EPA's claimed staffing shortage, arguing, *inter alia*, that "[the] EPA has not shown that it cannot supplement the currently-assigned SPPD staff with other EPA staff[,]" or "that it would be impossible to hire more contractors to act more quickly[,]" or "that no SPPD or otherwise qualified agency staff-time is assigned to purely 'discretionary' activities[.]"  (Pls.' Combined Reply in Supp. of Pls.' Mot. for Summ. J. & Opp'n to EPA's Cross-Mot. ("Pls.' Reply"), ECF No. 31, at 27–28 (citations omitted).)  Plaintiffs further insist that the overdue rulemakings must be prioritized, and that, if necessary, the agency can "redirect resources from other regulatory initiatives to ensure the fullest use of resources to fulfill its obligations."  (Pls.' Mot. at 42–43 (internal quotation marks and citation omitted).)

The EPA's other main argument is that Plaintiffs' schedule fails to acknowledge the complexity of the rulemakings at issue, and that the RTR rulemaking process involves nine distinct phases that must be completed for each individual source category.  (*See* Def.'s Mem. at 16–24; *see also* June Tsirigotis Decl. ¶¶ 13–21.) According to the EPA, it will take approximately twenty-eight months to complete the fastest rulemaking—for the Mercury Emissions from Mercury Cell Chlor-Alkali Plants source category—and approximately fifty-eight months to complete the longest—for the Primary Magnesium Refining source category.  (*See* June Tsirigotis Decl. ¶ 12, Tables 2 & 3 (attached hereto as Appendix A); *see also* Def.'s Reply at 6.)  Plaintiffs counter that the EPA's proposed timeline to complete each phase not only includes "discretionary" time that is not required to complete the rulemakings, but is also

characterized by "speculative and equivocal language" about what *may* (as opposed to what *will*) be required at each phase, and adds "extra, hypothetical time" to complete tasks that may not ultimately be required.  (Pls.' Reply at 35.)

The parties' cross-motions for summary judgment are ripe for this Court's review (*see* Pls.' Mot.; Def.'s Cross-Mot.; Pls.' Reply; Def.'s Reply; Pls.' Surreply Opposing Def.'s Cross-Mot. for Summ. J. ("Pls.' Surreply"), ECF No. 37), and the Court heard the parties' arguments on the cross-motions during a motion hearing held on November 30, 2017 (*see generally* Hr'g Tr.).

## II.  LEGAL STANDARDS FOR REMEDYING A CLEAN AIR ACT VIOLATION

The Clean Air Act permits "any person [to] commence a civil action on his own behalf" against the EPA "where there is alleged a failure of [the EPA] to perform any act or duty . . . which is not discretionary with [the agency]."  42 U.S.C. § 7604(a).  The Act also empowers district courts to "order [the EPA] to perform" a mandated act or duty and to "compel [non-discretionary] agency action unreasonably delayed[.]"  *Id.* The D.C. Circuit has interpreted this provision as allowing district courts to exercise their equity powers "to set enforceable deadlines both of an ultimate and an intermediate nature[.]"  *Nat. Res. Def. Council, Inc. v. Train*, 510 F.2d 692, 705 (D.C. Cir. 1974).

While a district court possesses broad discretion to set deadlines for compliance, it may not, of course, order the EPA "to do an impossibility."  *Id.* at 713 (internal quotation marks and citation omitted); *see also Cal. Cmtys.*, 241 F. Supp. 3d at 207 (rejecting plaintiffs' proposed timeline as being "simply too compressed . . . to afford any reasonable possibility of compliance" (internal quotation marks and citation

omitted)); *Sierra Club*, 2016 WL 1055120, at *3 ("[C]ourts should not demand a deadline for agency compliance that is impossible or infeasible."). But an agency has a "heavy burden to demonstrate" that the ordered requirements are impossible to meet, or that it is unable to comply with a particular remedial timeline. *Ala. Power Co. v. Costle*, 636 F.2d 323, 359 (D.C. Cir. 1979). That burden "serves to prevent an agency from shirking its duties by reason of mere difficulty or inconvenience[,]" *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 168 (D.C. Cir. 2017), and it "is especially heavy where the agency has failed to demonstrate any diligence whatever in discharging its statutory duty to promulgate regulations and has in fact ignored that duty for several years[,]" *Sierra Club v. Johnson*, 444 F. Supp. 2d 46, 53 (D.D.C. 2006) (internal quotation marks and citation omitted). Thus, courts "must scrutinize carefully claims of impossibility, and 'separate justifications grounded in the purposes of the Act from the footdragging efforts of a delinquent agency.'" *Id.* (quoting *Train*, 510 F.2d at 713). Courts should also be wary of agency arguments "that additional time is needed simply to improve the quality or soundness of the regulations to be enacted[,]" *id.*, or "that competing regulatory priorities preclude compliance with statutorily-mandated deadlines[,]" *id.* at 54.

Notwithstanding the heavy burden that an agency bears to prove its inability to comply with deadlines imposed by a statute that mandates certain agency obligations, the D.C. Circuit has "recognized two possible legitimate constraints on the agency's ability to meet a statutory deadline[.]" *Id.* at 53. First, a court must be mindful of the "budgetary commitments and manpower demands [that are] required[,]" and thus avoid imposing deadlines that "are beyond the agency's capacity or would unduly jeopardize

the implementation of other essential programs." *Train*, 510 F.2d at 712.  Second, it is generally acknowledged that, at times, "[the] EPA may be unable to conduct sufficient evaluation of available control technology to determine which is the best practicable[,] or may confront problems in determining the components of particular industrial discharges." *Id.*  In such circumstances, "additional time [may be] necessary to [e]nsure that the guidelines are rooted in an understanding of the relative merits of available control technologies" and "to give meaningful consideration of the technical intricacies of promising control mechanisms[,]" which "may well speed achievement of the goal of pollution abatement by obviating the need for time-consuming corrective measures at a later date." *Id.*

## III.    ANALYSIS

It is clear to this Court that the EPA has failed to satisfy its "heavy burden to demonstrate . . . impossibility," *Ala. Power Co.*, 636 F.2d at 359, either with respect to the commencement of its work on the nine overdue RTRs at issue in this case, or with respect to the completion of the review processes that Congress has required. Therefore, as explained below, this Court finds that the EPA's proposed schedule— which requests another seven years to complete rulemakings that are *already* between six and eight years late—is not the fastest possible schedule, and the Court will give the EPA until October 1, 2021, to complete its RTRs and any associated rulemaking activities.

### A.    The EPA Has Not Demonstrated That It Is Impossible To Begin Work Before March Of 2020

The Court's first concern arises with respect to the EPA's contention that it will not be able to begin the RTRs at issue in this case, or any associated rulemakings, until

March of 2020 (*see* Def.'s Mem. at 9), because of "39 other RTR rulemakings in which [the] EPA is either currently engaged or will begin shortly" (*id.* at 13). The agency points to the "limited number of personnel with the expertise needed to conduct the necessary reviews and develop additional regulations" (*id.* at 14–15) as the primary reason for its proposed delay in starting the work at issue. But the EPA's assertion that it needs more than two years to even begin working on the instant RTR rulemakings is unsatisfactory, for at least two reasons.

First, the agency has admitted that it is possible to "utilize contractors for certain tasks" and to "use personnel from areas of [the] EPA other than SPPD to work on the RTR rulemakings[.]" (*Id.* at 29–30.) The agency's declarant acknowledges that the EPA has "re-programmed resources [from other agency divisions and offices] in order to accelerate" the completion of court-ordered projects in the past, albeit at the expense of other, unidentified projects. (June Tsirigotis Decl. ¶ 12.) *See also Sierra Club*, 444 F. Supp. 2d at 54 ("[S]hifting resources in response to statutory requirements and court orders is commonplace for [the] EPA." (internal quotation marks and citation omitted)). And while the EPA implies that its proposed schedule contemplates the use of outside contractors and other non-SPPD agency resources, it has not demonstrated that it is *impossible* for the agency to hire new personnel, including outside contractors, or to reprogram additional existing agency resources *right away*, in order to accelerate the commencement of the instant overdue rulemakings. (*See* Pls.' Reply at 27–28.) To be sure, making such a showing might be difficult, given the agency's current representations that it does not need additional funding from Congress to satisfy its obligations at this time, and in fact can fulfill its "Core Mission" of "Improv[ing] Air

Quality" with an almost fifty percent reduction in its air quality-related budget from Fiscal Year 2017 levels. (*See* Pls.' 2d Notice at 4 (internal quotation marks omitted); Ex. G to Pls.' 2d Notice, ECF No. 41-9, at 2.)  But if the agency's proposed schedule is to be countenanced, then it must at least *try* to make a persuasive claim that it is currently so cash strapped that it cannot possibly start the mandated reviews given the resources that it *already* has, notwithstanding its recent representations.

Second, the EPA's admission that at least some "of the SPPD's resources are devoted to projects that are not subject to statutory deadlines" (Def.'s Reply at 10–11) undermines its claim that all potentially available resources are already fully utilized on other court-mandated rulemakings.  The agency concedes that at least three "fulltime equivalents" ("FTEs") within SPPD are currently dedicated to discretionary, non-statutorily-mandated projects.  (*See* Decl. of Panagiotis Tsirigotis ("Sept. Tsirigotis Decl.") ECF No. 34-1, ¶ 7.)[4]  And as Plaintiffs correctly observe, this admission pertains to "just the number of FTEs within SPPD that [the] EPA has allocated to" some of the discretionary projects that Plaintiffs have identified in their summary judgment motion.  (Pls.' Surreply at 4 (emphasis omitted); *see also* Pls.' Reply at 28–29 (listing "discretionary" activities in which the EPA is purportedly engaged and which are not "statutorily mandated").)  There may well be others; the EPA has made no representations regarding the total number of otherwise-available FTEs that are currently assigned to the agency's other discretionary actions, and while Plaintiffs have identified other discretionary activities that the agency has taken while this case has

[4] The term fulltime equivalent ("FTE") commonly refers to the total hours that one fulltime employee works in a year, or the equivalent hours worked by several part-time employees.

been pending—e.g., efforts to amend previously finalized rules in order to extend industry compliance deadlines, and steps to repeal certain existing emission guidelines (*see* Pls.' Surreply at 4–6; Pls.' Notice at 2; Pls.' 2d Notice at 1–4)—the EPA has neither denied its participation in such discretionary activities, nor provided any information about the number of SPPD or other agency staff who are working on such matters.  Without that evidence (which the agency bears the burden of providing under the circumstances presented here), it certainly seems plausible that the EPA could reallocate additional FTEs from those kinds of discretionary activities to address the overdue RTR rulemakings.

Even if no more than three or four FTEs are reallocated to the RTRs in this case, the record indicates that such an increase would boost the manpower that the EPA currently has dedicated to completing its mandatory statutory obligations by nearly ten percent (*see* Sept. Tsirigotis Decl. ¶ 5 (explaining that thirty-seven FTEs are currently available to perform the RTR reviews)), which is not a "relatively small" amount (*id.* ¶ 7), all things considered.  Indeed, the EPA admits that relatively few FTEs are needed to complete each RTR rulemaking.  (*See id.* ¶ 6 (acknowledging that "the least complex [RTR] projects have historically required about 1 FTE within SPPD[, while t]he most complex [RTR] projects have required about 3 FTEs within SPPD").)  On a complexity scale of one to three, the EPA has classified five of the source categories at issue here as a "one" (the least complex), four source categories as a "two" (medium complexity), and none as a "three" (the most complex).  (*See* June Tsirigotis Decl. ¶¶ 11–12.)  Thus, it seems that three or more additional FTEs could have a measurable impact on the EPA's ability to complete the overdue rulemakings expeditiously.

To be clear, this Court does *not* conclude that other agency activities for which there is no specific statutory deadline are "frivolous" (Def.'s Reply at 10), and it agrees with the EPA's suggestion that attending to such matters as "enforcement actions or providing guidance to states regarding implementation of environmental regulations" (*id.*) is important. Be that as it may, when Congress has ordered the EPA to act by a certain deadline, "it is inappropriate for [the] agency to divert[,] to purely discretionary rulemaking[,] resources that conceivably could go towards fulfilling obligations clearly mandated by Congress." *Sierra Club*, 444 F. Supp. 2d at 57. And, indeed, "[t]o accept such [a practice] in the face of a congressional direction would effectively amount to condoning a fully discretionary approach to a nondiscretionary duty." *Id.* at 54 (internal quotation marks and citation omitted).

Of course, this Court cannot ignore the fact that the EPA is subject to other recent court orders regarding mandatory review obligations that have constrained the agency's ability to devote all of its time and energy to addressing the overdue RTR-associated rulemakings at issue in this case. (*See* Def.'s Reply at 13 (urging this Court not to "ignore the real world").) *See also Sierra Club*, 2016 WL 1055120, at *3 ("There is nothing . . . that suggests the Court must consider how long the EPA could complete the requested rulemakings in isolation."). But, again, the applicable standard is *impossibility*, and in this Court's view, the EPA has failed to demonstrate that it would be impossible for the agency to follow a more expeditious schedule than the one that it proposes in light of its existing responsibilities, and this is especially so with respect to the proposed commencement date. Because the EPA has not shown that it cannot hire outside contractors, or reallocate existing EPA staff from other agency subcomponents,

or cease discretionary activities, and thereby start working on the rulemakings at issue here before March of 2020, this Court will order the EPA to begin the instant RTRs and associated rulemakings sooner, i.e., after its completion of the first tranche of the existing court-ordered RTR reviews.

### B. The EPA Has Not Demonstrated That It Is Impossible To Complete The Nine-Phase Rulemakings More Expeditiously

As noted above, the EPA has identified nine distinct phases of the RTR rulemaking process, and it has also predicted how long it believes the agency needs to complete each phase, and thus the entire rulemaking, for each of the nine instant RTR-associated rulemakings. (*See* Appendix A.) But in this Court's judgment, the EPA has not shown that it would be impossible to complete the overdue rulemakings on a more expedited schedule, and in certain respects, it is crystal clear that a faster schedule is possible, because the agency's proposal includes significant periods of time to complete work that may never actually occur.

For example, *all* of the time that the EPA has allocated for Phase III to collect supplemental information—eighteen months for three of the source categories, and seven months for another source category—is, at least today, hypothetical; the EPA has not made "a final determination" that supplemental information is even required, and will not make that determination until after "the preliminary information collection phase for each [rulemaking]." (June Tsirigotis Decl. ¶ 15(a).) The EPA has also built an additional six months into its proposed schedule for all nine source categories, to facilitate a review of each rule by the Office of Management and Budget ("OMB") pursuant to Executive Order 12866 (*see id.* ¶¶ 18(f), 21(e)); yet such OMB reviews are completely discretionary. *See, e.g.*, *In re United Mine Workers of Am. Int'l Union*, 190

16

F.3d 545, 551 (D.C. Cir. 1999) (rejecting argument that the OMB review provision of the executive order excused party's failure to meet a statutory deadline); *Nat. Res. Def. Council, Inc. v. Ruckelshaus*, No. 84-cv-758, 1984 WL 6092, at *4 (D.D.C. Sept. 14, 1984) ("OMB review is not only unnecessary, but in contravention to applicable law."). (*See also* June Tsirigotis Decl. ¶¶ 18(f), 21(e) (acknowledging that OMB review is only conducted "for projects that are considered significant regulatory actions").)

The EPA's proposed schedule also includes additional hypothetical, contingent time that may never be needed. Thus, the agency adds two weeks to the review time for each source category, in order to conduct "a risk-based demographic assessment[,]" but it admits that no such review will be needed if it turns out that the "risks are well below a level of concern[.]" (June Tsirigotis Decl. ¶ 17(d).) This Court does not know whether the risk-based demographic assessment, or any of the other contingent time included in the EPA's schedule, will ultimately be necessary for the agency to fashion well-reasoned final rules, but neither does the agency, and that is precisely the point. Under the "impossibility" standard that the D.C. Circuit has adopted, an agency must be ordered to complete the mandated tasks within the most efficient timeframe possible, and a schedule that affords time for the EPA to complete tasks that may or may not be necessary does not comport with the requirement that the minimum possible timeframe be adopted.

But while the EPA's proposed schedule in the instant case is too lax, it appears that Plaintiffs' proposed schedule is much too draconian. Plaintiffs have provided no evidence to support their contention that the EPA can possibly complete its RTRs and associated rulemakings within the next two years. And Plaintiffs are mistaken to rely

17

on the "statutory scheme" and "legislative design" of the Clean Air Act as evidence with respect to this timing issue. (*See* Pls.' Mot. at 46–47 ("[T]he Act directs that, starting from scratch, [the] EPA must, within two years, promulgate emission standards for over 40 major source categories, as well as other rulemakings." (emphasis omitted)); Pls.' Reply at 42 ("The Clean Air Act directs that [the] EPA will conduct many air toxics rulemakings in no more than two years . . . and complete a combination of as many as 165 rules and review rulemakings in two to three years.").) To begin with, it is clear on the face of the statute that Congress adopted an eight-year—not a two-year— window within which the EPA must complete the RTRs and rulemakings at issue here, and the statute does not speak to how much of that eight-year timeframe should be dedicated to the mandated process. *See* 42 U.S.C. § 7412(d)(6), (f)(2); *see also Cal. Cmtys.*, 241 F. Supp. 3d at 205 ("A standard of *how often* something should take place does not describe how long the thing should take." (emphasis in original)). It is likely that Congress did not intend for the EPA's rulemaking to take the entire eight years, but there is simply no basis for importing the Act's two-year deadline for promulgating *initial* emission standards, *see* 42 U.S.C. § 7412(e)(1)(A), into the entirely separate eight-year cycle for completing the RTRs and associated rulemakings. Additionally, Congress did not speak to a specific remedy for a violation of the eight-year review period, or mandate a time by which overdue rulemakings must be completed. Coupled with the lack of specifics to support Plaintiffs' proposed schedule, this Court simply has no principled basis for adopting the undifferentiated two-year schedule that Plaintiffs propose.

Taking into account all of the above, while "Plaintiffs' timeline may be 'simply too compressed at this stage to afford any reasonable possibility of compliance[,]'" *Cal. Cmtys.*, 241 F. Supp. 3d at 207 (quoting *Sierra Club*, 444 F. Supp. 2d at 58); *see also Blue Ridge*, 261 F. Supp. 3d at 61 (same), this Court concludes that the EPA has failed to demonstrate that its proposed schedule is the fastest possible plan for completing the instant rulemakings. Luckily, there is a middle ground between Plaintiffs' schedule and the EPA's schedule, and given the various representations by the agency, it is reasonable to expect the EPA to complete all nine of the overdue RTRs and rulemakings within thirty-three months of the commencement of its work. (*Cf.* Def.'s Mem. at 28 (touting two and a half years as "a 'useful benchmark' in evaluating what deadlines are possible for the Agency to meet" (quoting *Cal. Cmtys.*, 241 F. Supp. 3d at 205)).) This means that once the instant reviews get underway, which will be on or before January 1, 2019, the EPA can be reasonably expected to act diligently to complete all of these rulemakings by October 1, 2021. And if more time is eventually needed, the agency can "move for an extension of [the] deadline[s] where appropriate," as it has done in the past. (Def.'s Mem. at 27–28; *see also* Hr'g Tr. at 10:2–5 (indicating that Plaintiffs would "be very happy" to allow for an extension if the EPA does, for example, "need to gather additional information").) *See also Train*, 510 F.2d at 712 ("[P]alliative measures may be taken with regard to specific categories if indicated at a later date.").

## IV.    CONCLUSION

The EPA has not said that it would be impossible to reallocate existing personnel from other parts of the agency or to hire new personnel, including outside contractors, to begin performing at least part of the overdue rulemakings now, nor has it shown that

qualified agency staff resources are being spent only on mandatory activities. To top it off, the EPA has indicated publicly that it has no need for additional resources with respect to its Clean Air Act responsibilities, and the extended schedule it proposes for the overdue RTRs at issue here includes time for work that may be unnecessary and thus may never occur. Therefore, this Court will not accede to the agency's proposed timeline, but it will also reject the impossibly compressed deadlines that Plaintiffs suggest. Instead, as set forth in the accompanying Order, the EPA will be required to begin the instant rulemakings no later than January 1, 2019, after completing its first tranche of the existing court-ordered RTR reviews, and it will be further ordered to complete all nine overdue rulemakings no later than October 1, 2021. Consequently, Plaintiffs' motion for summary judgment is **GRANTED** to the extent that it seeks an order setting a schedule for the mandatory rulemakings, and **DENIED** with respect to the schedule proposed, and Defendant's request for the schedule set forth in its cross-motion for summary judgment is **DENIED**.

DATE: March 31, 2018

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge

# APPENDIX A

| EPA ESTIMATE FOR FINAL RULEMAKING BY SOURCE CATEGORY | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Source Category** | **Phase I Days** | **Phase II Days** | **Phase III Days** | **Phase IV Days** | **Phase V Days** | **Phase VI Days** | **Phase VII Days** | **Phase VIII Days** | **Phase IX Days** | **Final Rule Date[5]** |
| Mercury Emissions from Mercury Cell Chlor-Alkali Plants | 30 | 45 | 0 | 45 | 104 | 270 | 90 | 90 | 184 | July 22, 2022 |
| Semiconductor Manufacturing | 60 | 90 | 0 | 90 | 44 | 321 | 90 | 90 | 184 | Nov. 10, 2022 |
| Generic MACT II – Cyanide Chemicals Manufacturing | 60 | 90 | 0 | 90 | 44 | 349 | 90 | 90 | 184 | Dec. 8, 2022 |
| Generic MACT II – Spandex Production | 60 | 90 | 0 | 90 | 44 | 349 | 90 | 90 | 184 | Dec. 8, 2022 |
| Generic MACT II – Carbon Black Production | 60 | 90 | 0 | 90 | 104 | 366 | 90 | 90 | 184 | Feb. 23, 2023 |
| Primary Copper Smelting | 60 | 90 | 210 | 90 | 104 | 422 | 90 | 120 | 238 | Feb. 8, 2024 |
| Flexible Polyurethane Foam Fabrication Operations | 60 | 90 | 547 | 90 | 44 | 390 | 90 | 120 | 238 | Oct. 10, 2024 |
| Refractory Products Manufacturing | 60 | 90 | 547 | 90 | 104 | 365 | 90 | 120 | 238 | Nov. 14, 2024 |
| Primary Magnesium Refining | 60 | 90 | 547 | 90 | 104 | 421 | 90 | 120 | 245 | Jan. 16, 2025 |

[5] Each of the EPA's proposed final rule dates is calculated using the agency's requested start date of March 16, 2020.